FILED

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
LEE COUNTY, FLORIDA                                  2000 CIVIL DIVISION

E.S., individually, and on behalf of, B.S.,
a minor,

    Plaintiff,

v.

SCHOOL BOARD OF LEE COUNTY,
FLORIDA,

    Defendant.
_____/

CASE NO.

COMPLAINT AND
JURY DEMAND


   COMES NOW the plaintiff, E.S., individually, and on behalf of her son, B.S., by
and through their undersigned attorneys, and alleges as follows:

## PARTIES

1. The plaintiff, E.S., is an individual, sui juris, who resided in Lee County, Florida at
all times relevant, and is the natural mother of B.S., a minor.

2. The defendant, SCHOOL BOARD OF LEE COUNTY, FLORIDA ("BOARD") is
a body corporate and governmental agency duly empowered by the Constitution
and Statutes of the State of Florida to administer, manage, and operate the Lee
County Public Schools ("LCPS") within the Lee County School District
("LCSD"), Lee County, Florida.

## JURISDICTION AND VENUE

3.  Jurisdiction for this action lies pursuant to Section 26.012(2)(a) of the Florida Statutes (1997).

4.  Jurisdiction for this action lies pursuant to Section 48.193(1)(a) & (b) of the Florida Statutes (1997) in that the defendants reside in the state and carry on business within the state.

5.  Venue for this action vests pursuant to Section 47.011 of the Florida Statutes (1997) in that the defendants reside and conduct business in Lee County, Florida.

## GENERAL ALLEGATIONS

6.  The BOARD receives state and federal funding for education.

7.  B.S. was born on July 3, 1990 and is the minor child of E.S., his natural mother..

8.  From the age of 15 months, B.S. has been receiving speech and language services. He has been diagnosed as a child with autism and to have speech and language deficits, including but limited to dyspraxia, apraxia, and difficulty with sensory integration.  He has also been receiving occupational therapy and physical therapy.

9.  B.S. has been identified as a student entitled to receive exceptional student education ("ESE") services due to his disabilities.

10. Disputes arose between E.S. and the BOARD regarding B.S.' educational and related services within LCSD and E.S. demanded a due process hearing pursuant

2

to 20 U.S.C. § 1400 et seq. ("IDEA"), Section 230.23(4)(m) of the Florida Statutes, and Fla. Admin. Code R. 6A-6 et seq.

11.  On October 26-29, 1999, the Honorable Lawrence P. Stevenson, an Administrative Law Judge ("ALJ") of the Division of Administrative Hearings ("DOAH"), conducted the final hearing in Fort Myers, Florida at the James P. Adams Building, 2055 Central Avenue, Fort Myers, Florida.

12.  On November 17, 1999, Judge Stevenson issued a Final Order. A copy of the Final Order is attached hereto as Exhibit "A" and incorporated herein by reference.

13.  The BOARD did not appeal the Final Order and the Final Order has become final.

14.  E.S. is the prevailing party from the Final Order.

15.  E.S. has retained the law firm of J. Michael Hussey & Associates and is obligated to pay a reasonable fee for their services.

## COUNT I
### (Attorney's Fees)

16.  E.S. repeats and realleges the allegations in paragraphs 1 through 15 of the Complaint as if fully set forth herein.

17.  Pursuant to 20 U.S.C. § 1415(i)(2)(b)(i), E.S. is entitled to attorney's fees as prevailing party.

18.  Pursuant to § 230.23(4)(m)5, Fla. Stat. (1997), E.S. is entitled to attorney's fees as prevailing party.

19.   Pursuant to Fla. Admin. Code R. 6A-6.03311(6), E.S. is entitled to attorney's fees as prevailing party.

20.   Prior to filing this suit, E.S. made a demand upon the BOARD for payment of attorney's fees and costs incurred in enforcing her legal rights.

21.   The BOARD has failed to pay E.S. her reasonable attorney's fees and costs.

WHEREFORE, E.S. demands judgment against the BOARD for attorney's fees, costs, and interest incurred in pursuing her legal rights.

## COUNT II
### (IDEA)

22.   E.S. repeats and realleges the allegations in paragraphs 1 through 15 and 17 of the Complaint as if fully set forth herein.

23.   B.S. is entitled to a free and appropriate public education ("FAPE") pursuant to the IDEA.

24.   The BOARD has failed to provide FAPE to B.S. by failing to design an appropriate Individual Education Plan ("IEP") for B.S.

25.   The BOARD has failed to provide FAPE to B.S. by failing to implement an appropriate IEP for B.S.

26.   The BOARD has failed to provide FAPE to B.S. by failing to fund an independent educational evaluation for B.S.

27.   As a result of the denial of FAPE, B.S. has sustained loss of educational benefit and E.S. has incurred expenses to provide educational and related services to B.S.

4

WHEREFORE, E.S. demands judgment against the BOARD and requests this court to enter an Order for the BOARD to:

(1) reimburse the expenses incurred by E.S. for educational and related services;

(2) develop an appropriate IEP; and

(3) pay the reasonable costs and attorney's fees incurred by E.S.;

together with such further relief as the court deems just and equitable.

## COUNT III
(Florida Law)

28.   E.S. repeats and realleges the allegations in paragraphs 1 through 15, 18, 19, and 24 through 27 of the Complaint as if fully set forth herein.

29.   B.S. is entitled to a free and appropriate public education ("FAPE") pursuant to the Section 230.23(4)(m)5 of the Florida Statutes (1997).

WHEREFORE, E.S. demands judgment against the BOARD and requests this court to enter an Order for the BOARD to:

(1) reimburse the expenses incurred by E.S. for educational and related services;

(2) develop an appropriate IEP; and

(3) pay the reasonable costs and attorney's fees incurred by E.S.;

together with such further relief as the court deems just and equitable.

## COUNT IV
### (CIVIL RIGHTS-PROCEDURAL DUE PROCESS)

30.   E.S. repeats and realleges the allegations in paragraphs 1 through 15 of the Complaint as if fully set forth herein.

31.   At all times relevant, the BOARD and its agents were acting within the course and scope of their employment.

32.   At all times relevant, the BOARD and its agents were state agents.

33.   At all times relevant, the BOARD and its agents were acting under the color of law.

34.   The BOARD, pursuant to 20 U.S.C. § 1415(d)(2)(D);  34 C.F.R. § 300.501(a)(1); § 228.093(3)(a), Fla. Stat. (1997); and Fla. Admin. Code R. 6A-6.03311(7), owed E.S. a duty to provide her with a copy of B.S.' records.

35.   E.S. made several oral and written requests to LCSD for copies of all of B.S.' records.  The BOARD failed to timely produce the records requested.

36.   The BOARD's failure to produce B.S.' records deprived E.S. of her right to procedural due process under the United States and Florida Constitutions.

37.   By violating E.S.' constitutional rights, the BOARD deprived E.S. of her civil rights pursuant to 42 U.S.C. § 1983.

38.   The BOARD has a custom or policy of failing to provide records to parents of children with disabilities.

6

39.   The BOARD's custom or policy of failing to provide records to parents of children with disabilities was the moving force behind the deprivation of E.S.' civil rights.

40.   As a result of the deprivation of her civil rights, E.S. has been damaged.

WHEREFORE, E.S. demands judgment against the BOARD for damages, together with her attorney's fees and costs pursuant to 42 U.S.C § 1988, and such further relief as the court deems just and equitable.

## COUNT V
### (CIVIL RIGHTS-SUBSTANTIVE DUE PROCESS)

41.   E.S. repeats and realleges the allegations in paragraphs 1 through 15, 31 through 35, and 37 through 40 of the Complaint as if fully set forth herein.

42.   The BOARD's failure to produce B.S.' records deprived E.S. of her right to substantive due process under the United States and Florida Constitutions.

WHEREFORE, E.S. demands judgment against the BOARD for damages, together with her attorney's fees and costs pursuant to 42 U.S.C § 1988, and such further relief as the court deems just and equitable.

## COUNT VI
### (CIVIL RIGHTS-FEDERAL STATUTE)

43.   E.S. repeats and realleges the allegations in paragraphs 1 through 15, 23 through 27, and 31 through 33 of the Complaint as if fully set forth herein.

7

44. The BOARD's failure to provide FAPE pursuant to the IDEA to B.S. deprived B.S. of his civil rights pursuant to 42 U.S.C. § 1983.

45. The BOARD has a custom or policy of failing to provide FAPE to children with disabilities.

46. The BOARD's custom or policy of failing to provide FAPE to children with disabilities was the moving force behind the deprivation of B.S.' civil rights.

WHEREFORE, E.S., on behalf of B.S., demands judgment against the BOARD for damages and compensatory education, together with her attorney's fees and costs pursuant to 42 U.S.C § 1988, and such further relief as the court deems just and equitable.

## JURY DEMAND

E.S. demands a trial by jury for all issues triable as of right by a jury.

J. MICHAEL HUSSEY & ASSOCIATES
Attorneys for Petitioner

By _J. Michael Hussey_
J. Michael Hussey, Esquire
Florida Bar No. 305154
Paul E. Liles, Esquire
Florida Bar No. 0921270
P.O. Box 540
Fort Myers, FL  33902-0540
(941) 997-2800
(941) 997-4053 (fax)

8

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

B. S.,                              )
                                    )
        Petitioner,                 )
                                    )
vs.                                 )      Case No. 99-4169E
                                    )
SCHOOL BOARD OF                     )
LEE COUNTY,                         )
                                    )
        Respondent.                 )
_____    )

## FINAL ORDER

Pursuant to notice, a formal hearing was conducted in this case on October 26-29, 1999, in Fort Myers, Florida, before Lawrence P. Stevenson, a duly-designated Administrative Law Judge of the Division of Administrative Hearings.

### APPEARANCES

        For Petitioners:  J. Michael Hussey, Esquire
                          Paul E. Liles, Esquire
                          J. Michael Hussey & Associates
                          Post Office Box 540
                          Fort Myers, Florida  33902-0540

        For Respondent:  Keith B. Martin, Esquire
                         School Board of Lee County
                         2055 Central Avenue
                         Fort Myers, Florida  33901-3988

### STATEMENT OF THE ISSUES

The issues presented for decision in this case are whether Respondent, the School District of Lee County (the "District"), has failed to provide Petitioner B.S. ("B.S."), a child with disabilities, a free and appropriate public education ("FAPE"); what the appropriate educational placement for B.S. is; whether the District administratively determined B.S.'s educational

placement prior to development of the Individualized Education
Program ("IEP") on September 15, 1999; whether the District
failed to give proper notices to B.S.; and whether the District
failed to provide an Independent Educational Evaluation ("IEE"),
pursuant to the Individuals with Disabilities Education Act
("IDEA"), 20 U.S.C. Section 1401 et seq., 34 C.F.R. Section
300.001 et seq., Section 230.23, Florida Statutes (1997), and
Chapter 6A-6, Florida Administrative Code.

<u>PRELIMINARY STATEMENT</u>

By letter from Petitioner's counsel to counsel for the
District, dated October 1, 1999, Petitioner requested a due
process hearing pursuant to Section 230.23(4)(m)5., Florida
Statutes, and Rule 6A-6.03311(5), Florida Administrative Code.
On October 5, 1999, the District forwarded the hearing request to
the Division of Administrative Hearings for assignment of an
Administrative Law Judge and conduct of a hearing within the
guidelines set forth in the aforementioned statute and rule.  On
October 5, 1999, the matter was assigned to the undersigned
Administrative Law Judge, who issued a notice that the hearing
would be conducted October 19-21, 1999.

On October 14, 1999, counsel for Petitioner filed a Motion
for Continuance, citing prior court commitments.  A telephone
hearing was held on the motion and an order was entered on
October 18, 1999, rescheduling the hearing to October 25-27,
1999, without waiver of the 45-day period for entry of a final
order.  The hearing was convened on October 25, but the illness
of counsel for Petitioner resulted in the agreement of all

parties to reschedule the hearing for October 26-28, 1999.  The hearing could not be completed in the allotted time and was therefore extended, concluding on October 29, 1999.

At the final hearing, E.S. testified on B.S.'s behalf and presented the testimony of Leslie Sinclair, Director of Eden Florida, an outreach program for children and adults with autism; Leah Schneider, a senior clinician at Eden Florida; Kimberly Willis, a speech/language pathologist at Eden Florida; and Michael Tice, an attorney who previously represented Petitioner.

Respondent presented the testimony of Barbara Conroy-Gaiser, a speech pathologist in the District's early intervention program; Susan Morris, the District's special education coordinator; Allen Becker, a school psychologist for the District; Nancy Hoppe, an occupational therapist with the District; Kathy Blankenship, a consultative teacher with the District, accepted as an expert in the educational needs of and the design of educational programs for autistic and speech-impaired students; Michelle Perry, a District teacher in charge of the delivery of services to autistic children at Villas Elementary School; Elizabeth Scott, an occupational therapist with the District; Tracy Shedd, a speech and language pathologist with the District; and Barbara Lindner, Director of Therapeutic Integration Services, Inc.

Petitioner's Exhibits A through H and J through K were admitted into evidence without objection.  Respondent objected to Petitioner's Exhibit I on the basis of relevance, and ruling was withheld at the hearing.  The objection is hereby overruled and

3

Petitioner's Exhibit I is admitted.  Respondent's Composite
Exhibit 1 and Exhibits 2 and 3 were admitted into evidence.

The parties filed Proposed Recommended Orders on November 10,
1999.

## FINDINGS OF FACT

Based upon all of the evidence, the following findings of
fact are determined:

1.  The District is the agency responsible for providing
primary and secondary public education in Lee County, Florida.

2.  The District receives state and federal funding for
education.

3.  B.S. was born on July 3, 1990, in Lee County and is the
minor child of E.S., who is his natural mother.  E.S. testified
that she first noticed B.S. was not developing normally when he
was about 6 months old.  Shortly thereafter, B.S. was diagnosed
with autism, and the family moved to Chapel Hill, North Carolina,
to participate in a research project at the University of North
Carolina that provided on-site direct services to B.S.

4.  Since he was 15 months old, B.S. has received speech
and language services.  He has been diagnosed as a child with
autism and speech and language deficits, including but not
limited to dyspraxia, apraxia, and difficulty with sensory
integration.  He has also received occupational therapy and
physical therapy, but not on a continual basis.

5.  A persistent problem for B.S., at least in recent
years, has been self-abusive behavior.  In particular, B.S. tends
to strike his own ear with either his open hand or fist,

4

sometimes with a force and constancy that has required hospitalization for damage B.S. has inflicted upon himself.

6.  B.S. attended Leadmine Road Elementary School from at least December 1996 through December 10, 1997.  B.S.'s educational placement there was in a class for severely profoundly mentally handicapped with 6 other students.  Leadmine Elementary is a public school in Wake County, North Carolina.

7.  On April 28, 1997, Developmental Therapy Associates, Inc., of Durham, North Carolina, issued an Occupational Therapy Progress Report for the period of November 15, 1996, through April 28, 1997.  B.S.'s progress was noted to be affected by his state of health.  In particular, he showed regression in all areas following a severe sinus infection that led to surgery.  Recommendations included continuing occupational therapy services three times weekly with focus on sensory motor experiences to improve fine motor skills, self-care abilities, and interaction with people and objects in his environment.

8.  Another evaluation, styled "Psychological Report," was performed by Wake County Schools in April and May 1997.  The evaluation indicated B.S. was making progress in his then present educational placement.  Statements included:

> B.S.'s attention is still variable, although
> at times he will seem more focused for longer
> periods of time . . .  He is beginning to
> handle small group situations . . .  He is
> much more responsive to his teachers.
>
> B.S. also was able to follow several steps
> while at the computer, an increase in his
> attention and focus that was not observed in
> December . . .  B.S. was variably attentive
> to the children in the room.  He seemed to
> peripherally attend to them when they were

near him and the teacher stated that at times
B.S. would seek out one child in the room.

This was a marked improvement in his
communication skills from his behavior in
December.

B.S. tended to vocalize more, using a variety
of consonants and vowels and was more tuned
into the environment . . . He smiled more,
was more willing to complete items when they
were presented . . . was more receptive to
asking for assistance when doing new tasks as
opposed to his earlier behavior of not
interacting with the materials at all . . .
B.S. has begun to demonstrate more attention
to adult voices and commands, being able to
be quiet to a direction, look at a person who
is talking, and vocalize 3 or more
feelings . . . B.S. is more consistently
smiling when spoken to, requesting
continuation of activities he wants.

9.  On May 27, 1997, E.S. received notice that evaluations
had been completed on B.S. and that a meeting had been scheduled
for June 3, 1997, to discuss the results.

10.  B.S. was moved to Washington Elementary School, a
public school in the Wake County school system, on December 10,
1997.  He was placed in a class with 6 other autistic students.
There was one teacher and two aides.  The classroom was an open
room with small work areas.  Noise was kept to a minimum.  The
TEACCH instructional methodology, pioneered by the University of
North Carolina, was used in the classroom.

11.  According to E.S., B.S. regressed in his educational
skills while in this classroom.  She testified that he showed
increased self-injurious behavior, decreased communication
skills, decreased affect, and decreased eye contact.  She
summarized matters by stating that B.S. "fell apart" during this

time, which led her to begin exploring educational alternatives for her son.

12.   E.S. testified that she learned about Eden Florida in December 1997.   She had performed extensive research into programs for autistic children nationwide before settling on Eden Florida.   In 1996, she visited the Eden facility in New Jersey and read books on their programs.   She visited Eden Florida in December 1997 and spoke with parents whose children were in the program there.   She then began making arrangements to move to Fort Myers, which is her and her husband's hometown, and to enroll B.S. in Eden Florida.

13.   An occupational therapy progress report was completed for B.S. on January 1, 1998.   The dates covered by the evaluation were April 28, 1997, to January 9, 1998.   The report indicated educational progress for B.S. in his then present educational program.   Statements included:

> [B.S.'s] performance consistency has improved during this reporting period and he continues to make steady progress in all areas . . . [B.S.] has exhibited a remarkable increase in exploration and self-initiation in the home and treatment environments . . .   [B.S.] is less sensitive to sounds and movement over all . . .   He has exhibited an increased awareness of and interest in verbal expression.   Response time between a spoken direction and [B.S.]'s follow-through has decreased notably.   Consistency of response has improved.   Eye contact and turn taking has increased.   [B.S.] has begun to explore his own verbal expression, often vocalizing and verbally approximating to communicate . . .   He has also increased his expression of success and frustration, and each is considered progress in terms of communication . . .   Posturally, [B.S.] made consistent gains.

> [B.S.]'s performance across tasks and
> interaction with others improves
> significantly.

14.   E.S. testified that this was the report of a private
occupational therapist who worked with B.S. in a structured
clinical environment, one-to-one.   E.S. testified that she paid
for this private therapy in an effort to get B.S. back to the
level he was before the classroom experience began.

15.   In March 1998, E.S. moved to Fort Myers and enrolled
B.S. into Eden Florida.   She did not enroll B.S. in a District
public school at that time.

16.   Eden Florida is a non-profit organization that
specializes in providing services to people with autism.   Leslie
Sinclair, the Director of Eden Florida, testified as to the Eden
program, which she stated is based on applied behavior analysis.
Eden Florida provides one-to-one services with a behavior
therapist. in a small classroom, as well as speech and language
therapy and occupational therapy.

17.   One aspect of applied behavior analysis is the
"discrete trial" methodology.   Eden Florida employs the "discrete
trial" methodology in teaching autistic children.   This is a
process whereby the teacher first gives the student an "Sd," or
verbal cue; observes whether the student complies with the cue;
then, if necessary, the teacher provides a prompt, which early in
the process may involve physically moving the student through the
desired behavior, but which ideally "fades" to gestures that
prompt the student to perform the desired behavior on his own,
with the goal of eliminating the need for any prompts;

reinforcement, which is a reward of some sort for performance of
the behavior and is also intended to be "faded" over time; and
measurement of the student's progress.

18.  Daily raw data sheets are kept that chart the student's
behavior in each session.  These sheets are converted to monthly
graphs that provide a visual display of the student's progress
over time.  For B.S., data sheets and graphs were also
accumulated to show his progress in reducing the incidents of ear
hitting.

19.  "Mastery" of a given behavior under the Eden Florida
system is usually considered to be a successful response rate of
90 to 100 percent over a given trial period, usually three
consecutive sessions.  After B.S. was enrolled in the District,
Eden Florida used the 80 percent mastery rate prescribed by the
District's IEP.

20.  On March 4, 1998, Eden Florida developed an IEP for
B.S., which provided for 4 hours per week of speech therapy; 10
hours per week of pre-academics; 2.5 hours per week each for
physical education, domestics, and lunch; 1 hour and 40 minutes
per week of music/art; 1.5 hours per week each for socialization
and self-care; and 1 hour per week for private sensory
integration.

21.  When B.S. was first enrolled in Eden Florida, his ear
hitting was so frequent and intense that Eden staff had
difficulty assessing his ability to use his hands.  B.S. made
almost no eye contact and interacted minimally with his

environment.  He had intense vestibular regression and could not
tolerate noise or music.  He would not get on a swing by himself.

22.  On March 12, 1998, Eden Florida conducted a speech and
language assessment on B.S.

23.  On March 13, 1998, Eden Florida sent a letter to E.S.
concerning the hours of B.S.'s school day and scheduling an
increase in speech/language therapy for B.S.

24.  On March 23, 1998, Eden Florida prepared a summary of
B.S.'s program at Eden Florida and his goals for educational
development, including:  appropriate sitting; gross motor
imitation; responding to one-step functional commands; verbal
imitation of phonemes; fine motor imitation in the oral area;
receptive object identification; matching letters, numbers,
shapes, and colors; pre-handwriting; appropriate isolate play;
dressing; self-feeding with utensils; student initiated requests;
music and movement; art; sensory integration; and speech/language
therapy.

25.  Several witnesses testified as to the layout of B.S.'s
classroom.  While their estimates of its dimensions differed,
there was general agreement that it is a small room, no bigger
than 8 feet by 8 feet.  If the room is not technically
"soundproof," it admits little noise when the door is closed.  In
the room are 2 facing chairs, one for B.S. and one for his
teacher.  Next to the teacher's chair is a small table.  The room
also contains a cabinet and a bookshelf.  The door contains an
observation window with one-way glass that prevents persons

inside the room from seeing out.  Observers outside the room may listen to the teaching session via headphones.

26.  On May 28, 1998, the District sent out a notice to parents concerning the availability of Summer School at Eden Florida for children with autism, and provided a registration form to access services at Eden Florida.  Up to this time, E.S. had been paying the fees at Eden Florida out of pocket, except for certain therapy services that were reimbursed through insurance.

27.  The registration form was sent to E.S. at her request, after she learned through another parent that Eden Florida had a contract with the District for summer school services for autistic students.

28.  On June 15, 1998, the District enrolled B.S. "in the program for Autism, speech/language at Eden for the extended school year on a temporary basis" and gave E.S. notice of the placement, which she signed.  The notice indicated that she was given a form titled "Procedural Safeguards," but E.S. did not in fact receive that form.

29.  On June 15, 1998, the District gave E.S. an "Informed Notice of Reevaluation," stating the District's intent to conduct developmental, psychoeducational, speech/language, and motor/physical reevaluations of B.S.  E.S. signed the form, thus giving her consent for the reevaluations.

30.  On June 15, 1998, a Multidisciplinary Team meeting was held and a staffing report was completed.  Additionally, a "temporary" IEP was developed by District personnel that

determined B.S. was eligible for services as a student with
autism, speech and language deficits, and receiving occupational
therapy services.  B.S. was assigned to attend Eden for the
extended school year.  E.S. agreed with the IEP and indicated
that she would provide transportation.

31.  Also on June 15, 1998, District staff completed a
"Matrix of Services for funding under the Florida Education
Finance Program."  The Matrix listed B.S.'s primary
exceptionality as "Autistic," and also listed "Language
Impaired," "Occupational Therapy," and "Speech Impaired" as other
exceptionalities.  B.S. was scheduled for extended school year
funding at Eden Florida for 1200 minutes per school week, 200
minutes of which were to be spent with "non-ESE Persons."  B.S.
was noted to need intensive instruction; an intensive,
individualized behavior management plan requiring a very small
group or one-to-one intervention; personal assistance with his
daily living; daily assistance with health concerns; and daily
assistance with communication needs.

32.  On July 6, 1998, E.S. entered into an agreement to pay
Eden $1,000.00 per month until the balance of $9,450.00 for
services previously rendered was paid in full.

33.  On August 21, 1998, District personnel developed an IEP
for B.S.  His exceptionalities were listed as:  "Autism, Speech &
Language."  Improvement in all domains from the prior IEP was
noted pursuant to a verbal report from Leslie Sinclair, the
Director of Eden Florida.  Ms. Sinclair opined that no Behavior
Intervention Plan was necessary because B.S. had shown marked

improvement in his ear hitting behavior since commencing at Eden
Florida.   In addition to a classroom teacher, the IEP recommended
a full-time one-to-one aide with appropriate training.   The
District recommended placement at Villas Elementary, a public
school in Lee County.

34.   E.S. testified that none of the evaluations to which
she consented for the August 21, 1998, IEP meeting was actually
performed.   Rather, the IEP team relied on the North Carolina
records, other histories, and records provided by Eden Florida,
as well as Barbara Lindner's records of her occupational therapy
treatment sessions.

35.   Leah Schneider, a senior clinician at Eden Florida who
works with B.S., testified that a problem with the August 21,
1998, IEP was that it did not establish a baseline skill level
for B.S. in the various areas for which goals were set.   She
testified that Eden Florida sets such a baseline for any new
student by first discussing the student's abilities with his
parents, then testing the student without the use of any prompts.

36.   E.S. opposed the placement recommendation at Villas
Elementary and requested a due process hearing.   The due process
hearing was scheduled but continued and subsequently dismissed
after the District agreed to continue funding B.S.'s placement at
Eden Florida.

37.   E.S. testified that she objected to placement at Villas
Elementary at the August 21, 1998, meeting because she had
visited the school and believed it was inappropriate for B.S.   At
that time, the classroom in which she understood B.S. would be

placed was in a portable, and she testified it was very noisy.
She testified that the Villas teacher told her there was nothing
she could do about the sound, which E.S. believed would prove
distracting to B.S. and detract from his performance in school.

38.   E.S. testified that it was her feeling that the
predominant issue for the District was funding rather than the
appropriateness of Eden Florida as opposed to Villas Elementary.

39.   E.S.'s suspicions were confirmed by the testimony of
Barbara Conroy-Gaiser, the District's Coordinator of
Communication Disorders in the Exceptional Student Education
("ESE") program, who stated that the District decided to allow
B.S. to "stay put" at Eden Florida in anticipation of obtaining
"a reasonable rate" on a contract with Eden, as well as the
desire to avoid litigation.

40.   Ms. Conroy-Gaiser testified that any disputes between
the District and Eden Florida were solely over money, not over
any substantive aspect of the Eden educational program.

41.   On September 4, 1998, the District offered a consultant
contract to Eden Florida to provide consultative services to
various schools in the District.   Eden Florida accepted it on
September 4, and Leslie Sinclair on behalf of Eden Florida signed
the original contract on October 5, 1998.

42.   After the development of the August 21, 1998, IEP, B.S.
showed a great increase in his ear-hitting behavior, to a
recorded frequency of 1,262 hits during a five-hour period.
Between September 14 and 16, 1998, an "Eden Decision Model
Behavior Reduction Program Development Checklist" was completed

to assess B.S.'s self-injurious behavior and to develop an
appropriate behavior program.   In particular, it was noted that
B.S. was unable to work at discrete trials effectively because he
was constantly engaged in ear-hitting behavior.   The checklist
noted that B.S.'s ears were red and sore due to hard, repeated,
self-inflicted blows.

43.   On September 30, 1998, Eden Florida sent the District
invoices for consultation services and for speech therapy at Eden
Florida for B.S.   The invoices covered services provided from
September 8 through September 30, 1998.

44.   On October 1, 1998, Eden Florida sent a letter to E.S.
regarding payment for services at Eden Florida for September and
October 1998.

45.   On October 30, 1998, Eden Florida sent the District
invoices for consultation services and for speech therapy at Eden
Florida for B.S.   The invoices covered services provided from
October 1 through October 29, 1998.

46.   On January 14, 1999, E.S. and Eden Florida entered into
an agreement for respite care for B.S. at Eden.

47.   Despite the fact that E.S. had signed a consent form on
June 15, 1998, for reevaluations in the areas of developmental,
psychoeducational, speech/language, and motor/physical, and an
IEP has been in place for B.S. since August 21, 1998, the
District took no action to perform any of the reevaluations until
March 31, 1999.

48.   Allen Becker, the District's school psychologist, and
Nancy Hoppe, the District's occupational therapist, testified

that they would have been available to perform their observations and evaluations at almost any time after June 15, 1998, but were not contacted to do so until March 1999 and April 1999, respectively.

49.  Ms. Conroy-Gaiser testified that this delay was due to the fact that B.S. was in place at Eden Florida and "the parent was happy."  She testified that the District needed to get the evaluations done in the spring "to move forward with staffing" for the coming school year.

50.  On March 31, 1999, Ms. Conroy-Gaiser sent a memo to E.S. proposing reevaluations of B.S. in the areas of developmental, psycho-educational, and speech/language skills. Though the memo twice referred to "proposed" reevaluations, it also stated that the reevaluations "will be conducted," and referenced the procedural safeguards available to E.S. should she dissent from the "proposal."

51.  Ms. Conroy-Gaiser testified that the normal procedure is for the persons performing the evaluations to schedule the testing sessions, but that in this instance they asked for her help because they were "highly frustrated" at their inability to schedule the sessions.

52.  On April 8, 1999, Ms. Conroy-Gaiser sent a memo to E.S. styled "Revised Notice of Re-evaluation."  This notice indicated re-evaluations in the areas of developmental, psycho-educational, speech/language skills, as did the prior notice, but added a re-evaluation of occupational motor skills to the list. Ms. Conroy-Gaiser testified that E.S. was showing some resistance

to having these meetings, and her letters were meant to explain the District's intentions.

53. E.S. testified that she signed the June 15, 1998, consent form prior to the arrival of her son's records from North Carolina, so that the District could perform its own evaluations. When the records from North Carolina arrived, the District staff deemed them sufficient to write an IEP on August 21, 1998. Therefore, E.S. wondered why these reevaluations suddenly needed to be performed in April 1999. E.S. testified that District personnel would only tell her it was a formality having to do with "paperwork" that had to be completed.

54. Ms. Conroy-Gaiser testified that her perception of E.S.'s position was that the June 15, 1998, consent form was "too old" to be used for this time. She testified that Terry Andrews, a District ESE Coordinator, contacted Iris Anderson, a compliance specialist at the Florida Department of Education, regarding the usable life of consent forms.

55. A handwritten memo from Ms. Andrews to Ms. Conroy-Gaiser indicates that Iris Anderson suggested that the District could either "go to due process to obtain reevaluation" or could use formal evaluations done by Eden Florida. The memo does not state whether Ms. Anderson directly answered the question whether the consent form was stale due to the passage of time.

56. In this regard, it is noted that the language of the consent form states: "The attached page describes the reevaluation for your child, <u>which will be conducted during the current school year</u>." (Emphasis added.) Neither party offered

evidence on how the term "current school year" would be applied to a consent form signed during the summer recess. Thus, it appears that to the extent E.S. claimed the consent form was "too old," she had at least a colorable ground for that claim.

57. On April 19, 1999, E.S. sent a letter to Ms. Conroy-Gaiser's attention acknowledging receipt of the letters of April 4 and April 11, 1999, concerning B.S.'s reevaluations. E.S. requested to be informed as to the intent of the testing before she would agree to consent, taking the position that all of B.S.'s evaluations were current and his progress records were shared with the District by Eden Florida. E.S. also wanted to know which tests would be performed, what records would be reviewed, who would be administering the tests, and who would be evaluating the results. E.S. requested a written response. E.S. also stated that B.S.'s "school placement at Eden this year has been productive and beneficial for him. For the first time in years, he is excited about school, achieving goals, and making progress."

58. On April 19, 1999, Diane Levy, the District speech/language pathologist who would participate in the reevaluations of B.S., wrote the following to Ms. Conroy-Gaiser regarding her efforts to schedule testing: "In a telephone conversation with [E.S.], it appeared that she would not allow an appointment to be made. She declined to say anything except that she had addressed her concerns in a letter. She was pleasant but adamant. [Allen Becker] & I will wait to test. Diane."

59.   The District's telephone logs reflect the efforts to schedule the reevaluations.  An April 19, 1999, entry states that E.S. "said that she wanted more recent notification."

60.   On April 21, 1999, Nancy Hoppe, a District occupational therapist, sent an e-mail to Ms. Conroy-Gaiser regarding an occupational therapy ("OT") evaluation for B.S.  She reported that Eden Florida wanted a copy of the parent's consent for evaluation.  She also reported that she had contacted E.S., who stated that Ms. Hoppe "needed the appropriate consent form signed and the notification for evaluation should be sent."  Ms. Hoppe indicated that she had a consent form signed by E.S. on June 15, 1998.  E.S. advised her that this consent was "too old."

61.   On May 5, 1999, Ms. Conroy-Gaiser sent a memo to E.S. in response to her April 19, 1999, letter.  Ms. Conroy-Gaiser recited that B.S. had been given a "temporary assignment based on previous placement in a program in North Carolina," and that the reevaluations were necessary "so that a staffing committee can determine his eligibility thus potentially moving him from temporary to permanent status within the Lee County Schools." She reiterated the intent to reevaluate in the areas of developmental, psychoeducational, speech/language, and motor/physical, and noted that the form signed by E.S. on June 15, 1998, consented to these reevaluations.

62.   On June 9, 1999, Leslie Sinclair sent a letter to the District confirming that B.S. was entitled to the summer school program at Eden Florida and voicing her support of an extended school year program for B.S.  Ms. Sinclair stated that B.S. would

"regress if he is not afforded services after the summer school session."

63. On June 18, 1999, Diane Levy sent a handwritten note to Ms. Conroy-Gaiser regarding B.S.'s reevaluations at Eden Florida. Ms. Levy stated that she had scheduled the testing with Eden Florida to occur on June 30, 1999. However, Ms. Levy further stated that the secretary at Eden Florida recalled the earlier efforts to schedule reevaluations and inquired whether E.S. had been notified of the June 30, 1999, testing. Ms. Levy wrote that she told the secretary that "I, personally, would not be dealing with parent notification and could not address that at present."

64. Ms. Levy noted the following "concerns," which she stated were shared by Mr. Becker, the other District employee scheduled to test B.S. on June 30: "1. Will the parent be notified? (I would be uneasy about testing her son _without_ her _knowledge_.) 2. What do we do if Mom says _no_ and Eden wants to comply with parent's wishes?" (Emphasis in original.)

65. Ms. Levy concluded by stating that she knew the District had "the right to test," but that she hoped the logistics could be handled by the administrators, and that she and Mr. Becker could "just go out to Eden and do the testing."

66. E.S. testified that she was unaware of this communication between Ms. Levy and Ms. Conroy-Gaiser at the time it was made.

67. On June 25, 1999, Diane Levy observed B.S. during his morning schedule at Eden Florida for the purpose of completing a speech and language evaluation. Ms. Levy reported that she

observed B.S. at breakfast and during sensory stimulation,
teacher-directed "work" activities, snack (which included a
birthday party), outside play, and lunch.  Her evaluation
included observations in eye contact and joint attention;
receptive communication skills; expressive communication skills;
imitation; play; oral-motor, motor; behavior, and a summary of
B.S.'s communication strengths and needs.

68.  On July 13, 1999, Eden Florida issued a "Therapy
Report" regarding B.S.'s behavior therapy and the current status
of certain skills.  It was noted that B.S. was receiving "clinic
based behavior therapy 5 days a week for 5 hours per session" at
Eden Florida.  Current status was reported in the areas of:
Learning Readiness Skills, Gross/Fine Motor Skills, Pre-Academic
Skills, Expressive Language, Social/Play Skills, Self Care
Skills, and Behavioral.

69.  On July 15, 1999, Eden Florida sent a consultant
contract to the District for B.S.'s extended school year (July 20
through August 13), reflecting a 6-hour, full day, one-to-one
program.

70.  On July 19, 1999, Ms. Sinclair sent a letter to
Dr. J. Frederick West, the District's ESE Director, setting forth
the per diem rate for students in a one-to-one setting at Eden
Florida.

71.  On July 23, 1999, Ms. Sinclair provided Dr. West a
breakdown of service provision for B.S. pursuant to a telephone
request by Ms. Conroy-Gaiser on July 22, 1999.  Ms. Sinclair
wrote that, based upon B.S.'s IEP, he was entitled to:  a school

day encompassing a full day one-to-one specialized program of 1500-1800 minutes per week; speech and language instruction up to 240 minutes per week; and occupational therapy up to 240 minutes per month. Ms. Sinclair stated that Eden Florida's tuition rate was $219.00 per day for services commensurate with the stated entitlements.

72. On July 27, 1999, Ms. Andrews sent a memo to Ms. Sinclair requesting copies of all records for B.S. generated by Eden Florida, including evaluations and assessments. Ms. Andrews requested that the copies be sent "so that I may receive them on or before August 2, 1999."

73. On July 28, 1999, Ms. Sinclair sent a fax to Ms. Andrews stating that Eden Florida had already provided the requested records regarding B.S., including records from North Carolina, to Dr. West in March 1999. Ms. Sinclair testified that the records already provided filled a paper ream box.

74. On July 29, 1999, Ms. Andrews sent a letter to Ms. Sinclair acknowledging that all records through March 25, 1999, had already been provided and requesting all records on B.S. generated after March 25, 1999. Again, Ms. Andrews requested the records be sent for her receipt no later than August 2, 1999.

75. On July 29, 1999, Ms. Andrews sent an e-mail to Susan Morris, the District's ESE Coordinator and the case manager for B.S., advising her to schedule a staffing meeting for B.S. on August 18, 1999, at 8:30 a.m. at the Hipps Building, where the ESE offices are located. Ms. Morris was instructed to invite the

following persons:  Leslie Sinclair; Diane Wilkes; a "regular ed"
teacher; an ESE teacher; Kathy Blankenship; and B.S.'s parents.

76.  On August 2, 1999, Eden Florida compiled the records
requested by Ms. Andrews on July 29, 1999.  These records were
received by Mary Liptak on behalf of the ESE Department at
8:30 a.m. on August 4, 1999.

77.  On August 4, 1999, Ms. Sinclair sent a letter to
Dr. West acknowledging his signing of the contract for services
at Eden Florida for B.S. through August 13, 1999.  Dr. West was
requested to contact Eden Florida upon receipt of the letter
regarding continuation of the contract for B.S. for the upcoming
school year.

78.  On August 11, 1999, Susan Morris sent a fax to
Ms. Sinclair acknowledging receipt of records from Eden Florida.
She requested that a "Functional Behavioral Assessment" be
conducted before the August 18, 1999, "reevaluation staffing"
meeting regarding B.S., if such assessment had not been done
recently.

79.  On August 11, 1999, Eden Florida prepared a summary of
its behavioral program for B.S.'s self-injury and sent that
summary to Susan Morris.  The summary noted that a functional
assessment had been conducted in September 1998 and that the Eden
Institute Decisional Model was used to perform the functional
assessment.  At that time, the baseline frequency averaged 1,262
hits of his ear with his hands in a 5-hour period.  The intensity
of hits was severe.  The summary stated that B.S.'s current rate
of self-injury for a consecutive 3-day period was: August 9,

1999: 64 times in a 6-hour day; August 10, 1999: 63 times in a
6-hour day; and August 11, 1999: 58 times in a 6-hour day.  The
intensity of hits was rated as mild, meaning attempts to hit the
ear with no or minimal contact.  The assessment indicated that
the antecedents to ear-hitting behavior were:  self-stimulation,
escape avoidance, attention-seeking, and communication
frustration.

80.  On August 13, 1999, the District sent E.S. a "Parental
Notification of Meeting," a form requesting the parent's
participation at a meeting involving "one or more of the
following checked items."  The only item checked on the form was:
"To discuss the results of your child's recent reevaluation."
The meeting was scheduled for August 18, 1999, at 8:30 a.m., at
the Hipps Annex.

81.  Internal correspondence indicates that District
personnel were aware no later than the afternoon of July 29,
1999, that the meeting was scheduled for August 18, 1999, at
8:30 a.m. at Hipps.  Nevertheless, the District's first written
notice to E.S. of the date and time of the meeting was sent no
earlier than August 9, 1999.

82.  On August 13, 1999, Leslie Sinclair sent a letter to
Susan Morris noting that E.S. "was agreeable to a re-evaluation
review at the IEP meeting now set for August 20, 1999."  Attached
to the letter was a current review of B.S.'s Behavior program.

83.  Ms. Morris testified that she did not know why
Ms. Sinclair referenced the date of August 20, 1999, as no
meeting had been scheduled for that date.  However, as noted

below, Ms. Morris did later attempt to serve E.S. with a
handwritten "Parent Notification of Meeting" form scheduling a
conference for August 20, 1999.

84. On August 16, 1999, E.S. signed the "Parent
Notification of Meeting" form, checking the box beside the
statement, "I will attend the meeting." E.S. also sent a
handwritten letter to Susan Morris indicating that she would
attend the meeting. In her letter, E.S. stated:

> This meetings [sic] intent as stated in
> notice is to simply discuss result of Speech
> reeval. No prior information or report of
> the reeval has been given to me and I will
> need time to process results before
> continuing to an IEP.
>
> Attached is parent notification form, (white
> copy) with my signature. This is my first
> written notice received for this meeting.

85. E.S. testified that her note was written after a
telephone conversation with Ms. Conroy-Gaiser, who told her that
the meeting's purpose was solely to go over a speech reevaluation
for B.S. E.S. testified that Ms. Conroy-Gaiser told her that the
District could "rectify their paperwork" with just a speech
reevaluation, so E.S. orally consented to its performance.

86. The District received a copy of E.S.'s letter on
August 17, 1999.

87. On August 17, 1999, the District's attorney sent a
letter to Leslie Sinclair demanding that all records concerning
B.S.'s education at Eden Florida, as requested by Ms. Andrews on
July 29, 1999, be turned over to Susan Morris "by 12:00 noon
today." Ms. Sinclair testified that she was puzzled by this
request. Eden Florida had already provided the District with all

records relating to B.S., and she could not understand why they were asking for those records again.

88.   Susan Morris wrote a letter, dated August 17, 1999, indicating that there had been an inadvertent omission on the Parent Notification of Meeting form.  The letter indicated that in addition to the checked box:  "To discuss the results of your child's recent reevaluation," another box should have been checked:  "To develop, review, or revise your child's Individual Education Plan.  It is important for you to attend this meeting and to have an opportunity to help us plan the educational goals for your child."

89.   The District's cumulative file contained a Parent Notification of Meeting form indicating that it had been revised on August 17, 1999.  The boxes on this revised form were checked consistent with Ms. Morris' letter of August 17, 1999.

90.   E.S. testified that she never received either the August 17, 1999, letter from Ms. Morris or the August 17, 1999, revision of the Parent Notification of Meeting form.

91.   On August 17, 1999, Susan Morris sent a letter to Leslie Sinclair acknowledging receipt of the information regarding the functional behavioral assessment for B.S.  The letter made no mention of the demand letter sent by the District's attorney on the same date.

92.   On August 18, 1999, a meeting was held the Hipps Annex. E.S. testified that she had requested the meeting be held at Eden Florida, but that District staff refused.  Ms. Sinclair confirmed that she requested the IEP meetings be held at Eden Florida, and

stated that no reason was ever provided for the District's
refusal of that request.  Ms. Sinclair stated that Eden Florida
has a space that could accommodate an IEP meeting.  Ms. Morris
testified that while it is typical to hold IEP meetings at the
child's school, the District chose to have this one at the Hipps
location.

93.  At the meeting, Ms. Morris handed E.S. a handwritten
"Parent Notification of Meeting" form scheduling a conference on
August 20, 1999, "to develop, review, or revise your child's
Individual Educational Plan."  E.S. refused to accept this form
or attend an IEP conference on two days' notice.  Both
Ms. Conroy-Gaiser and Ms. Morris testified that the District's
policy is to provide parents with ten days' notice of these
meetings.

94.  Ms. Morris testified that the purpose of this
handwritten notice was to enable the team to get through the
preliminary eligibility issues, but had no explanation as to why
the notice did not address eligibility issues.

95.  By the time of the August 18, 1999, meeting, only the
speech and language observation had been completed.  E.S. had not
been provided a copy of the report prior to the meeting, but was
given an opportunity to read the report at the meeting.
Ms. Conroy-Gaiser testified that the District's "best practice"
is not to provide such reports to parents prior to the meetings,
but to provide them at the meetings.

96.  The observations of the speech and language teacher
were also discussed.  The teacher stated that she wanted to do

more observation, because her observation was only for two hours and could be inaccurate.  She also stated that her report was not intended to form the basis for an IEP.

97.  On August 19, 1999, E.S. sent a letter to Dr. West stating that she had heard from Leslie Sinclair that an IEP meeting was being scheduled for August 27, 1999, but that she had not received formal notice.  She noted that only a speech evaluation had been completed as of the date of her letter, despite her signing a consent form for reevaluation on June 18, 1998.  E.S. requested that "a full reevaluation be completed to determine present levels in order to develop an IEP for the 1999-2000 school year."  E.S. stated "it is agreeable that [B.S.'s] current placement will stay and his current IEP be continued past Aug. 21, 1999."

98.  On August 20, 1999, Susan Morris sent a fax to Leslie Sinclair stating that E.S. had given permission to conduct a "psychoeducational/development assessment and occupational therapy evaluation" at Eden Florida for B.S.  Eden Florida acknowledged the dates and times and gave approval for Allen Becker, the psychologist, to perform his evaluation on August 24, and for Nancy Hoppe, the occupational therapist, to perform her evaluation on August 25, 1999.

99.  On August 23, 1999, E.S. received a Parent Notice of Meeting form sent out by Susan Morris on behalf of the District on August 19, 1999, for a conference on August 27, 1999.  The boxes next to the following items were checked:  "To consider eligibility/placement for your child in an Exceptional Student

Education Program.   Placement is based upon careful study and will occur only with your knowledge and written permission.   If your child is found eligible for an Exceptional Student Education Program, an Individual Educational Plan will be developed at this meeting;" and "To discuss the results of your child's recent reevaluation."

100.   This notice differed from the revised notice for the August 18 meeting in that it now included "eligibility" on the conference agenda, but did not include "to develop, review, or revise your child's IEP."   Ms. Morris testified that this change was made "to clarify purposes" for E.S.   She testified that E.S.'s request for a "reevaluation" triggered a requirement for a new eligibility determination for B.S.

101.   On August 24, 1999, E.S. signed the notice indicating that she would not be able to attend the meeting and requested that the meeting be rescheduled.   E.S. testified that she questioned the inclusion of "reevaluations" in the issues for the meeting, as she was unaware of any reevaluations other than the speech evaluation referenced above.

102.   Also on August 24, 1999, E.S. sent a letter to Susan Morris, referencing a telephone conference with Ms. Morris the previous day in which E.S. orally informed Ms. Morris that she was unavailable for the scheduled August 27, 1999, meeting. E.S.'s letter went on to list her concerns about eligibility determinations and the status of the reevaluations.   E.S. requested that she be provided copies of all reports prior to the meeting in order to be able to participate as a "team member" on

B.S.'s IEP.  E.S. further indicated she understood the need to
meet with B.S.'s team to develop an IEP for the 1999-2000 school
year.  E.S. stated:

> Please respond with clarification on [B.S.'s]
> eligibility as checked on invitation to
> conference and all written reports to me
> before we reschedule conference.  I would
> prefer this information in writing so as to
> be clear about what issues we'll be
> discussing related to [B.S.]' needs for his
> FAPE.

103.  The District received a copy of E.S.'s reply and letter
on August 24, 1999.

104.  On August 24, 1999, Leslie Sinclair promulgated a
Behavior Summary for B.S.  Among the problems noted were:
lacking interpersonal relationships among his peers and self-
injurious behavior.  She also noted that B.S. was becoming more
aware of his environment, and beginning to communicate through
both gestures and the use of a communication board.

105. .On August 25, 1999, Nancy Hoppe, a District
occupational therapist, conducted an "Occupational Therapy
Functional Assessment" at Eden Florida.  Ms. Hoppe noted as
educational concerns:  self-abusive behavior, decreased focus,
and delayed fine motor skills.  She recommended occupational
therapy services for 4 hours per month.  At the time she prepared
her report on September 3, 1999, Ms. Hoppe did not have a
"Sensory Integration Inventory" completed by either E.S. or
B.S.'s teacher.

106.  On August 25, 1999, Linda Carris, a District physical
therapist, conducted a "Physical Therapy Functional Assessment"
of B.S. at Eden Florida.  She listed as educational concerns:

low muscle tone; loose joints; poor throwing/catching skills; and decrease [sic] eye contact.  She recommended that B.S. be provided physical therapy services, but did not specify how many hours per month they should be provided.

107.  On August 25, 1999, Susan Morris sent a fax to Leslie Sinclair indicating that the IEP/Staffing for B.S. scheduled for August 27, 1999, had been canceled at the parent's request, and was being rescheduled for September 7, 1999.  She stated that the District was following up on the evaluations requested by E.S., and asked Ms. Sinclair to recommend a time for an adaptive physical education evaluation at Eden Florida.  Ms. Morris also requested more information regarding the Eden Institute Decision Model for functional assessment and motivational assessment scale.

108.  On August 26, 1999, Susan Morris sent a letter to E.S. in response to E.S.'s letter of August 24, 1999, in which she explained the reasons for "eligibility" being an issue for the upcoming meeting:

> As you know, your son was first provided
> special education services in North Carolina.
> When you moved to Lee County, the ESE
> Department was able to honor the Wake County,
> North Carolina IEP under Florida regulations
> for serving transferring students.  As a
> transferring student, [B.S.] was given a
> "temporary" status and his ESE services were
> continued.  The Florida Department of
> Education requires the school district to
> reassess a temporarily placed student and
> determine eligibility for continuing
> services.  This is the process we are trying
> to complete for [B.S.]

109.  Ms. Morris also listed the evaluations that were being completed and stated that "we will mail you reports as they are

31

113.   In addition to the concerns set forth in her letter,
Ms. Sinclair testified that she was also concerned that B.S.'s
response rates on the various tests were affected by the
frequency of the testing.

114.   Ms. Sinclair testified that no one from the District
came to her school to review records or observe B.S. prior to
August 18, 1999, with the exception of Diane Levy, the District's
speech language pathologist.  She further testified that between
August 18 and August 31, 1999, at least 5 people from the
District came to the school to test or observe B.S.  Finally, she
testified that since September 2, 1999, no one from the District
has come to the school to observe B.S.

115.   Ms. Morris testified that the scheduling adjustments
had already been accomplished by the time Ms. Sinclair's
August 26, 1999, letter was written.

116.   At the hearing, Ms. Morris was asked why there appeared
to be such urgency to perform all the evaluations in this
compressed period of time.  She responded that the District was
attempting to comply with the parent's wishes and complete all
the evaluations prior to the scheduled August 27, 1999, meeting.

117.   Ms. Morris' response is not credible.  E.S. requested
reevaluations, but did not ask that they all be performed within
the space of a week.  It is apparent from the testimony and from
the correspondence in evidence that the urgency in this regard
came from the District, not E.S.

118.  On August 27, 1999, Leslie Sinclair wrote a letter to Susan Morris requesting a statement "regarding the continuation of funds for [B.S.'s] placement through September 7, 1999."

119.  On August 30, 1999, E.S. received the "Parent Notification of Meeting" form for the September 7, 1999, IEP meeting.  The form indicates that it was sent on August 26, 1999. The following items were checked regarding the purposes of the meeting:  "To consider eligibility/placement for your child in an Exceptional Student Education Program.  Placement is based upon careful study and will occur only with your knowledge and written permission.  If your child is found eligible for an Exceptional Student Education Program, an Individual Educational Plan will be developed at this meeting"; and "To discuss the results of your child's recent reevaluation."

120.  E.S. testified that as of the date she received this notice, she still had not received any of the requested reevaluation reports.

121.  Kathy Blankenship, a consultative teacher with the District who specializes in developing IEPs and educational programs for children with autism, went to Eden Florida on or about August 30, 1999, to observe B.S.'s skill levels and confer with his teachers.  She observed B.S. in and out of his classroom for a period of approximately three hours.  Ms. Blankenship testified that the impetus for this observation was that she had been asked to sit on the IEP team for B.S.  E.S. was not informed of this visit prior to its occurrence.

122.   Ms. Blankenship testified that she observed B.S.'s
teacher using the discrete trial method, but she questioned
several things she saw during the session.   She noted that B.S.
was only successful 50 percent of the time in responding to the
cue, "touch 1," even with a prompt.   B.S. was also inconsistent
in responding to "touch yes" and "touch no" on his communication
board.

123.   Ms. Blankenship testified that the teacher was
inconsistent in responding to the reinforcers selected by B.S.,
going so far as to remove "no" from the communication board as an
option for B.S. when he chose it.   Ms. Blankenship opined that it
is necessary to deliver the reinforcer immediately to connect the
symbol with the consequence in the student's mind.

124.   Leslie Sinclair of Eden Florida disagreed with
Ms. Blankenship's opinion.   Ms. Sinclair testified that part of
"fading" is acclimating the student to intermittent
reinforcement.   Michelle Perry, who teaches at Villas Elementary
and would be B.S.'s teacher there, agreed with Ms. Sinclair as to
the importance of moving on to intermittent reinforcement so that
the child's behaviors may become generalized to settings beyond
the classroom.

125.   Ms. Blankenship testified that B.S. did stand up when
the teacher said, "[B.S.], stand up," but that it was unclear
whether B.S. was responding to the oral prompt because the
teacher herself stood up when she gave the oral cue.

126.   Ms. Blankenship testified that during the classroom
session she observed, B.S. was seated and not allowed to move for

the 50-minute duration of the session.  She testified that B.S. indicated "bathroom" on his communication board at least 3 times over the course of 35 minutes before he was allowed to go to the bathroom.

127.  Ms. Blankenship also observed B.S. on the playground. She saw 2 other children there, both much younger than B.S.  She saw no interaction between B.S. and these children, and no attempt to encourage such interaction.

128.  Counsel for the District questioned Ms. Blankenship as to which of the goals and objectives of the August 21, 1998, IEP she observed being worked on during her visit.  Ms. Blankenship had no difficulty answering these questions, in a generally negative fashion.

129.  However, when counsel for Petitioner attempted to question her on the same subject, Ms. Blankenship was unable to read many of the data forms used by Eden Florida, was unable to interpret those she could read, and at one point claimed she could not with confidence even read the August 21, 1998, IEP because she did not participate in its writing.  The undersigned credits her latter claim, and thus disregards her testimony as to the extent to which she observed the Eden Florida staff implementing the August 21, 1998, IEP.

130.  On September 1, 1999, Mark Millage, a District adaptive physical education teacher, prepared an "Adaptive PE Assessment" for B.S. based upon a 30-minute observation at Eden Florida. Among the problems noted were:  muscle tone, catching and

throwing, running, and kicking, for which Mr. Millage recommended
additional assistance.

131.  On September 2, 1999, Allen Becker issued a report for
evaluations conducted on August 24 and 31, 1999.  Mr. Becker
administered the PEP-R Behavior Scale, the Childhood Autism
Rating Scale ("CARS"), the Vineland Adaptive Behavior Scale
(Classroom edition), and reviewed the Behavior Summary describing
Eden Florida's functional assessment.

132.  The PEP-R yielded a total developmental age score of 14
months, indicating "cognitive functioning within the profound
range."  The scores ranged from 1 year and 10 months for fine
motor skills to 5 months for perception.  The other developmental
skills assessed by the PEP-R are imitation, gross motor, eye/hand
integration, cognitive performance, and cognitive verbal.

133.  The PEP-R also applies a behavioral scale to arrive at
a "somewhat subjective" rating of certain of the child's
behaviors as appropriate for the child's age, mildly
inappropriate, or severely inappropriate.  The behaviors rated
are relating and affect, play and interest in materials, and
sensory responses.  B.S.'s scores ranged from "appropriate" for
such behaviors as reaction to being tickled, using string, visual
sensitivity, and interest in taste and smell, to "mild" for
physical contact, response to the examiner's voice, awareness of
the examiner's presence, tolerance for interruptions, playing
alone, reaction to pain, auditory sensitivity, and interest in
textures, to "severe" for eye contact, affect, initiation of

social interaction, attention span, and behavior when engaged in tasks.

134.   B.S. scored in the severely autistic range on the CARS. Mr. Becker noted that, like the behavioral aspect of the PEP-R, the CARS scale is somewhat subjective.  Both Mr. Becker and Leslie Sinclair performed the CARS rating on B.S., and both arrived at the severely autistic rating.

135.   The Vineland was completed with E.S. as the respondent. The test indicated that B.S.'s overall adaptive behavior was significantly below average for his age.  B.S. scored significantly higher in socialization than in either communication or daily living skills.  Leslie Sinclair completed the Classroom edition of the Vineland, again resulting in a score indicating B.S.'s overall adaptive behavior to be significantly below average.

136.   Mr. Becker summarized his overall conclusions as follows:

> Observations and reports from Eden evidenced
> self-injurious behavior.  Significant needs
> are evidenced in the cognitive, behavioral,
> preacademic and adaptive behavior areas.
> Cognitive functioning appears to be similar
> the [sic] previous testing as seen in the
> psychological report from Wake County, North
> Carolina cited above.  There appears to be
> little initiation of social contact and
> little response to social contact outside of
> a very structured behavior program.  However,
> this examiner has had minimal opportunity to
> observe [B.S.] outside of the structured
> setting.

137.   On September 3, 1999, E.S. received a second notice, sent on September 1, 1999, for the September 7, 1999, meeting. On September 3, 1999, E.S. signed the notice indicating that she

would not be able to attend the meeting and would like to reschedule the meeting for another date.

138.  On September 3, 1999, E.S. also sent a letter to Susan Morris stating that E.S. would not be able to attend the meeting on September 7, 1999, due to schedule conflicts, and due to the failure of the District to provide the reports that were to be discussed.  E.S. also requested specifics on the procedures being relied upon by the District to determine B.S.'s eligibility.  She requested that the District state more specifically what issues were to be discussed at the next meeting.  The District received E.S.'s letter on September 3, 1999.

139.  On September 3, 1999, Susan Morris sent a letter to E.S. acknowledging receipt of E.S.'s letter.  She indicated that prior notice had been sent out on August 26, 1999, and that copies of B.S.'s evaluations would be sent to E.S. by courier that day.  Ms. Morris stated that if E.S. did not reply by 4:30 p.m. with a reasonable date in the near future for rescheduling the meeting, then the District would assume that E.S. wanted the meeting on September 7, 1999, to go forward.

140.  Later on September 3, 1999, Susan Morris sent a fax to E.S. stating that she was advised that E.S. was unable to respond by 4:30 p.m. on September 3, 1999, and requesting a response by 8:00 a.m., on September 7, 1999.

141.  On September 3, 1999, Susan Morris sent the following evaluation reports by courier to E.S.:  Psychoeducation/ Developmental Evaluation (Report from Allen Becker and Eden Florida); Fine and Gross Motor Evaluations (occupational therapy

39

and physical therapy); and Adaptive Physical Education.
Ms. Morris noted the meeting was scheduled for 9:00 a.m., on
September 7, 1999, at the Hipps Building.

142.  On September 6, 1999, E.S. acknowledged receipt of the
package sent by courier.  She advised Susan Morris that she did
not agree to a meeting on September 7, 1999, and suggested either
September 15 or 21, 1999, at 9 a.m. as alternatives.  E.S. stated
that she did not agree to any meeting on the IEP until B.S.'s
entire team (including personnel from Eden Florida) could be
coordinated to attend and be provided the reports obtained so
that they could be prepared for an IEP review for the 1999-2000
school year.

143.  On September 7, 1999, the District sent out a "Parent
Notification of Meeting" form setting the IEP conference for
September 15, 1999.  The boxes for the following items were
checked on the form:  "To consider eligibility/placement for your
child in an Exceptional Student Education Program.  Placement is
based upon careful study and will occur only with your knowledge
and written permission.  If your child is found eligible for an
Exceptional Student Education Program, an Individual Educational
Plan will be developed at this meeting"; and "To discuss the
results of your child's recent reevaluation."

144.  On September 8, 1999, Susan Morris sent a letter to
E.S. acknowledging receipt of E.S.'s September 6, 1999, fax
confirming unavailability for the September 7, 1999, meeting.
Ms. Morris stated that the meeting would be held at 9:00 a.m. on
September 15, 1999, and that copies of the reports would be

provided to Eden Florida staff.  She concluded by stating, "It is absolutely necessary that we write a new IEP for [B.S.] in order to provide him with appropriate services in accordance with state and federal regulations.  We are prepared to complete this process on 9/15/99."

145.  On September 10, 1999, 5 days before the scheduled IEP meeting at which B.S.'s placement was to be decided, Dr. West, the Director of the District's ESE program, sent an e-mail to Dr. Jane Kuckel, which states in relevant part:

> Jane, the IEP team meeting for [B.S.] is scheduled for Sept. 15 and we plan to submit to the Board a contract that will cover services at Eden through September 17, with [B.S.] coming into our District program on Monday, September 20.

146.  Susan Morris, among others, received a courtesy copy of Dr. West's e-mail on September 10, 1999.

147.  On September 15, 1999, a meeting was convened to write an IEP for B.S.  At the outset of meeting, Susan Morris stated: "We're going to review the assessments that were done for [B.S.] and talk about eligibility.  This is the part where we were discussing the fact before that when a child comes in from out of county, out of state, that the state allows us to bring children in on a temporary basis and then we reevaluate the child and redetermine the eligibility for placement, and that's where we are today."

148.  E.S. became concerned at the broaching of the topic of her son's eligibility for the ESE program, and repeatedly asked why his eligibility was in question after he had been placed in the Lee County school system for over a year.  Ms. Morris

repeatedly answered that eligibility had to be redetermined
because B.S. was still considered to be in a temporary placement.
E.S. disagreed with Ms. Morris' characterization of B.S.'s
placement as "temporary," given that an IEP had been in place for
a full year.  Ms. Morris would not answer E.S.'s request that she
delineate particular issues as to B.S.'s eligibility, stating
that she would answer that request in writing at a later time.

149.  At the meeting, E.S. emphasized that the evaluations
needed to consider not just B.S.'s current skill levels, but the
progress he has made since arriving at Eden Florida.  E.S. stated
that she did not disagree with anything that was discussed at the
meeting, but felt that more work needed to be done before the
team could proceed to write an IEP for B.S.

150.  At several points in the meeting, E.S. expressly
requested an IEE, because she did not believe the evaluations in
hand were a sufficient basis to write an IEP.

151.  Ms. Sinclair essentially concurred with E.S.'s
assessment.  She testified that more testing was required in the
areas of speech/language, B.S.'s learning profile, and his
behavioral assessments, before an IEP could be completed.
Ms. Sinclair believed the team had enough information on
September 15, 1999, to write goals and objectives for B.S., but
not to complete the IEP.

152.  After roughly two and one half hours, E.S. informed
Ms. Morris that she had to leave the meeting to attend a
previously scheduled appointment, and expressly stated that she
did not wish the IEP to be written in her absence.  E.S. left the

meeting, but the meeting continued in her absence and the IEP was written.

153. Virtually every witness testifying for the District stated that it is not uncommon for IEP meetings to adjourn and reconvene at later dates for the convenience of the participants. None of the District witnesses, including Ms. Morris, who chaired the meeting, offered a convincing reason why this meeting could not have adjourned so that E.S. could be present for the writing of her son's IEP.

154. The District tape recorded the IEP meeting until shortly after E.S. left the meeting. No one from the District could offer a reasonable explanation why the recording was stopped after E.S. left.

155. Review of the partial recording of the meeting makes it obvious that Ms. Morris as chair drove the group to complete the IEP at that September 15 session. It is difficult for the undersigned to find Ms. Morris' insistence on completing the IEP to have no connection with her receipt of the e-mail from Dr. West five days prior, in which Dr. West stated that "the IEP team meeting for [B.S.] is scheduled for Sept. 15 and we plan to submit to the Board a contract that will cover services at Eden through September 17, with [B.S.] coming into our District program on Monday, September 20."

156. At the September 15, 1999, District personnel for B.S developed an IEP. The basis for ESE services continued to be autism and speech and language. A reevaluation was recommended

158.   This section states a "Priority Educational Need":   "To increase functional communication for independent functioning and socialization."

159.   The IEP states 3 annual goals, each with several short-term objectives.   The first annual goal states:

> [B.S.] will interact with one peer in a two-minute period with no more than 5 prompts from an adult.

160.   There are 3 short-term objectives associated with the annual goal:

> 1.   [B.S.] will parallel play with an adult in close proximity of no more than 2 (two) feet of distance for two minutes.
>
> 2.   [B.S.] will interact in turn taking of 5 reciprocal turns in a two-minute period in a preferred task with an adult with no more than 5 prompts.
>
> 3.   [B.S.] will engage in parallel play with a peer for a two-minute period.

161.   The second annual goal states:

> Will attend to a sensory/motor task for (2) minutes with no more than (5) prompts from an adult.

162.   There are 3 short-term objectives associated with the annual goal:

> 1.   Will attend to a motor/sensory task for (30) seconds with no more than (5) prompts from an adult.
>
> 2.   Will attend to a motor/sensory task for (60) seconds with no more than (5) prompts from an adult.
>
> 3.   Will attend to a motor/sensory task for (90) seconds with no more than (5) prompts from an adult.

167.  For "Services, Placement and Assessment", the following
information is listed:

| Participation in Regular/Vocational Education | Purpose |
|---|---|
| Participation in physical education | socialization & gross motor imitation |
| Reverse mainstreaming | socialization and interactive play |
| Exceptional Student Education Services | |
| Instruction in pre-academics, socialization, behavior management | daily |
| Instruction in receptive & expressive communication | daily |
| Related Services | |
| Occupational therapy services | 360 min./month |
| Physical therapy services | 120 min./month |
| Adaptive Physical Education | average 1x/week |

168.  Under the section headed "State and Districtwide
Assessment Accommodations or Modifications," the "Alternative
Assessment Description and Rationale" block is checked and the
following statement appears:  "Data collection and portfolio
assessment.  IEP committee recommends alternative assessment as
most appropriate indicator of performance."

169.  Michelle Perry teaches the primary autism class at
Villas Elementary School, which is the class B.S. would most
likely attend.  She has 8 students with autism that range in age
from 5 to 9.  She has 3 classroom aides.  She has received
training at Eden Florida on the discrete trial method and

47

incorporates that and other methods in her classroom.  The
classroom is an open classroom that has several small work areas
for individual instruction, similar to the TEACCH model that B.S.
attended in North Carolina.  Noise from one work area can be
heard in others.  The teacher's desk is within a few feet of the
area where speech and language training is provided in the
classroom.  Her students have limited contact with typically
developing peers, mostly consisting of contact during the walk to
the classroom from the bus.  E.S. testified that the noise level
at Villas was greater than at the school in Wake County, North
Carolina.

170.  Tracy Shedd is the speech and language pathologist who
would provide services to B.S. at Villas Elementary.  Her review
of the IEP led her to estimate that she would provide B.S. with
30 minutes of speech and language therapy in class each day.  She
is not familiar with B.S.'s communication systems and has never
met B.S.

171.  Ms. Blankenship opined that the program offered by the
District is appropriate and the program being provided by Eden
was inappropriate.  She stated that the IEP team had sufficient
information on September 15, 1999, to write an IEP.  As noted
above, Ms. Blankenship only saw B.S. on August 31, 1999, between
10:00 a.m. and 1:20 p.m. at Eden Florida.  She observed him from
a space outside his classroom, in the lunch area, and the play
area.

172.  Ms. Blankenship noted that B.S. had attained a number
of skills in Wake County, North Carolina, and was performing at a

48

lower level during her observations at Eden.  She testified that
any program that caused B.S. to regress would not be an
appropriate program for his needs.

173. ⋅ Ms. Blankenship testified that the staff of Eden was
not implementing the August 21, 1998, IEP.  However, as also
noted above, Ms. Blankenship's replies became vague and evasive
under cross-examination on the same subject.  Ms. Blankenship
said she was unable to read many of the forms from Eden and that
she could not interpret them.  Ms. Blankenship was also unable to
identify statements that came directly from the text of the
interpretive notes to the rules implementing the IDEA.
Ms. Blankenship's opinion testimony is thus entitled to little,
if any, weight.

174.  Not one of the District teachers who would provide
services to B.S. and who appeared at the hearing could identify
B.S.'s present skill levels with regard to the annual goals or
short-term objectives in the IEP prepared on September 15, 1999.
Both E.S. and Leslie Sinclair testified that B.S. was already
performing the skills listed as annual goals and short-term
instructional objectives.

175.  Ms. Blankenship and Mr. Becker both noted regression in
B.S.'s skill levels when they compared his current state with the
Wake County Public Schools report conducted in April and May
1997, and both drew the conclusion that B.S.'s regression had
occurred since he enrolled at Eden.  They appeared to be
unfamiliar with B.S.'s history as regards the period between May
1997 and March 1998.

176.  As noted above, E.S. testified that her son's regression occurred after May 1997, when he was transferred to a public school classroom in North Carolina.  Ms. Sinclair verified that when B.S. enrolled at Eden Florida in March 1998, he had apparently regressed significantly from the observations recorded in the May 1997 North Carolina report.  There is no evidence that B.S. has done anything other than show marked improvement during his stay at Eden Florida.

177.  Barbara Lindner, director and owner of Therapeutic Integration Services, Inc., provided occupational therapy services to B.S. from July 1998 through July 1999, along with 2 other certified occupational therapists employed by her company. She testified that B.S. has become less defensive to touch, has increased awareness, greater tolerance for bearing weight on his upper extremities, and greater tolerance for such movements as swinging and hanging on a monkey bar, due to her occupational therapy services.  She testified that some portion of her services were paid for by E.S.'s insurance, but she could not recall the precise amounts.

178.  On Monday, September 20, 1999, E.S. received a letter in regular mail, dated Friday, September 17, 1999, from Susan Morris.  The letter stated that the IEP team had concluded "that the autism program at Villas Elementary School provides an appropriate educational program and placement to address [B.S.'s] educational needs in the least restrictive environment.  The initiation date to begin services at Villas Elementary School is September 20, 1999."  The letter concluded with the statement

that "Services at Eden of Florida will no longer be provided by the School District of Lee County as of September 20, 1999."

179.    Enclosed with the letter was a "Notice & Consent for Placement" form, which proposed to place B.S. in a "special class in a regular school (more than 12 hours weekly)".  E.S. did not consent to this placement and signed the form rejecting this placement decision on September 21, 1999.

180.    On September 21, 1999, E.S. retained the law firm of J. Michael Hussey & Associates to assist her and B.S. in their disputes with the District.

181.    On September 22, 1999, E.S., by and through her attorneys, sent a letter to the District, through its attorneys, addressing the problems with the District's decisions regarding the educational placement and the provision of services to B.S. These complaints included:  failure to provide proper notices of meetings, development of an IEP without sufficient input and without parent participation, failure to provide a written response to E.S.'s request for an IEE, and failure to provide transportation.  E.S. requested:  (1) Eden Florida to remain "stay put" for B.S. and for the District to continue funding at Eden until such time as all evaluations could be completed and an IEP could be held to determine all of B.S.'s needs; (2) the District to provide an IEE at public expense; (3) the IEP be rewritten after all the evaluations had been completed and reviewed; (4) an extended school day and extended school year services for B.S.; (5) reimbursement for transportation expenses incurred by E.S. during the time B.S. was enrolled in the

District; (6) attorney's fees and costs incurred by E.S.;
(7) tape recordings of the meeting on September 15, 1999, and
(8) copies of all of the files relating to B.S.  Absent complete
agreement, E.S. demanded a due process hearing.

182.  On September 24, 1999, the District, by and through its
attorney, provided a response to the claims raised by E.S., and
requested that E.S. indicate which of the evaluations she was in
disagreement with requested an IEE with respect thereto.  The
District agreed to make records available for either delivery or
pickup and agreed to maintain educational placement at Eden
Florida through October 1, 1999, and to reimburse E.S. for
reasonable costs of transportation from September 20, 1999,
through October 1, 1999.

183.  On October 1, 1999, E.S., by and through her attorneys,
responded to the District's letter of September 24, 1999.  E.S.
again demanded a due process hearing.

184.  On October 4, 1999, E.S., by and through her attorneys,
acknowledged the agreement by the District to continue funding
services for B.S. at Eden Florida pending a final order from the
Administrative Law Judge in the above-styled case.  Additionally,
transportation expenses were amended to conform to the distances
B.S. lived away from Eden during the period of time he was living
at each respective address.

185.  On October 7, 1999, Susan Morris sent a letter to E.S.
addressing the additional testing that E.S. sought to have
accomplished.  The District proposed that each of the tests be

performed by District personnel or others under contract with the District.

186.   On October 13, 1999, E.S. provided the District a copy of the sensory integration inventory.

CONCLUSIONS OF LAW

187.   The Division of Administrative Hearings has jurisdiction over the subject matter pursuant to Sections 120.57(1)(k) and 230.23(4)(m)5, Florida Statutes (1997), and Rule 6A-6.03311(5), Florida Administrative Code.

188.   Congress enacted the Individuals with Disabilities Education Act, 20 U.S.C. Section 1400 et seq. ("IDEA") "to ensure that children with disabilities receive an education that is both appropriate and free."  Florence County School Dist. Four v. Carter, 510 U.S. 7, 13 (1993)(citing School Comm. of Burlington v. Department of Educ. of Mass., 471 U.S. 359, 373 (1985)).

189.   The implementing regulations for the IDEA are located in 34 C.F.R., Part 300. See 34 C.F.R. Sections 300.1-300.589. See also 34 C.F.R. pt. 300, App. A. (Notice of Interpretation).

190.   In return for federal funds, IDEA directs the states to provide a free appropriate public education to ESE students.  See Curtis K. by Delores K. v. Sioux City Community School Dist., 895 F.Supp. 1197, 2005-06 (N.D. Iowa 1995).  To qualify for federal funding, states and local agencies are required to develop plans and policies to carry out the intent of the IDEA.  See Board of Educ. of Hendrick Hudson Cent. School Dist. v. Rowley, 458 U.S. 176, 180-81 (1982).

191.  The  Individuals  with  Disabilities  Education  Act,  20
U.S.C. 1401(a) (as amended in 1997), provides in pertinent part:

> "Free appropriate public education" is
> defined as:
>
> . . . special education and related services
> that (A) have been provided at public
> expense, under public supervision and
> direction, and without charge; (B) meet the
> standards of the state educational agency;
> (C) include an appropriate preschool,
> elementary, or secondary school education in
> the state involved; and (D) are provided in
> conformity with the [IEP] program required
> under [law].

192.  Section 230.23(4)(m), Florida Statutes (1997), requires
that Respondent provide for an "appropriate program of special
instruction, facilities, and services for exceptional students,"
including provisions that:

> 5.  No student be given special instruction
> or services as an exceptional student
> until after he or she has been properly
> evaluated, classified, and placed in the
> manner prescribed by the rules of the
> commissioner.  The parent or guardian of
> an exceptional student evaluated and
> placed or denied placement in a program
> or special education shall be notified of
> each such evaluation and placement or
> denial . . . [and] . . . she is entitled
> to a due process hearing on the
> identification, evaluation, and
> placement, or lack thereof . . . .

193.  Section 230.23(4)(m)5., Florida Statutes, was enacted
to carry out the mandates of the IDEA.  In the Interest of J.D.,
510 So. 2d 623, 627 n.2 (Fla. 1st DCA 1987).  To further
implement the IDEA, Chapter 6A-6, Florida Administrative Code,
was promulgated.  Id. at 627 n.3.  Through these statutes and
regulations, Florida law permits relief identical to the relief
available under the IDEA.  Compare Section 230.23(4)(m)5, Florida

Statutes (1997), and Chapter 6A-6, Florida Administrative Code,
with 20 U.S.C. Section 1400 et seq.  See also Hendry County
School Bd. v. Kujawski, 498 So. 2d 566, 568 (Fla. 2d DCA 1986)
(Florida's plan mirrors federal statute).

194.  Section 230.23(6), Florida Statutes, states:

> In providing for the education of exceptional
> students, the superintendent, principals, and
> teachers shall utilize the regular school
> facilities and adapt them to the needs of
> exceptional students to the maximum extent
> appropriate.  Segregation of exceptional
> students shall occur only if the nature of
> the severity of the exceptionality is such
> that the education in regular classes with
> the use of supplementary aides and services
> cannot be achieved satisfactorily.

195.  There are various classifications for ESE students
describing a wide range of handicapping conditions.  Among those
are the classifications for speech and language impaired, and for
"Profoundly Handicapped," under which autism is a qualifying
condition.  See Rule 6A-6.03012 and 6A-6.03021(1)(c), Florida
Administrative Code.

196.  B.S. has been identified as having speech and language
deficits, as well as autism, and is eligible for services as a
child with disabilities under both federal and state law.  See
Rules 6A-6.03012(2) and 6.03023(2), Florida Administrative Code.

197.  Children with disabilities are entitled to a free
appropriate public education, including special education and
related services, which are provided at public expense and
provided in conformity with individualized educational programs.
See 20 U.S.C. Sections 1400(c) and 1401(a)(18).

198.  Educational placement decisions must be based on the
IEP and made by a group of persons knowledgeable about the
disabled child, which must include the parent.  See 34 C.F.R.
Section 300.533; 34 C.F.R. pt. 300, App. A., sec. II.

199.  The District must ensure that a parent has a full right
to participate in all decisions pertaining to the IEP, including
placement decisions.  See 34 C.F.R. Section 300.345; 34 C.F.R.
pt. 300, App. A., sec. II.

200.  If placement in a private facility is necessary to
provide special education and related services to a disabled
child, the program must be at no cost to the parents.  See 34
C.F.R. Section 300.302.

201.  Section 1415(b)(1)(C) of the IDEA requires the District
to provide a written notice of actions that it either intends to
take or refuses to take regarding the education of a child with
disabilities.  See also 34 C.F.R. Sections 300.504-300.505.

202.  Section 1415(b)(1)(D) of the IDEA requires the District
to provide written notice of the procedural safeguards available
to children with disabilities.  See also Rules 6A-6.03032 and
6A-6.03311(1) and (2), Florida Administrative Code.

203.  Rule 6A-6.03311, Florida Administrative Code, provides:

    (7) Examination of records.

    (a) The parents of exceptional students
        shall be afforded, in accordance with
        Rule 6A-1.0955, FAC, and this rule, an
        opportunity to inspect and review all
        educational records with respect to the
        identification, evaluation, educational
        placement of the child, and the
        provision of a free appropriate
        education to the child.

 (b) The right to inspect and review
   education records under this rule
   includes the right to have a
   representative of the parent inspect and
   review the records.

204. Rule 6A-1.0955(6), Florida Administrative Code,

provides in relevant part:

 Each school board shall adopt a policy for
 educational records, which shall include:

    * * *

 (b) Provisions for permitting . . . the
   parent or guardian of the pupil who is
   or has been in attendance in the school
   district to inspect and review the
   education records of the adult student
   or pupil.  The district shall comply
   with a request within a reasonable
   period of time, but in no case more than
   30 days after it has been made.  The
   right to inspect and review education
   records under this paragraph includes
   the right to reasonable requests for
   explanation and interpretation of the
   records, and the right to obtain copies
   of the records . . . .

See also Section 228.093(3)(a)4, Florida Statutes (1997).

205.  Rule 6A-6.03311(5)(a), Florida Administrative Code,

provides that parents may initiate a due process hearing when

dissatisfied with the District's evaluation or educational

decision regarding their child.  See also 20 U.S.C. Section

1415(b)(2); 34 C.F.R. Sections 300.505-300.506.

206.  When an IEP has been challenged, a two-fold inquiry

must be conducted:  (1)  Has the State complied with the

procedures set forth in the IDEA? and (2) Is the IEP developed

through the IDEA's procedures reasonably calculated to enable the

child to receive educational benefit?  See Rowley, 458 U.S. at

206-07.  In this case, the District has clearly failed to comply

with IDEA procedures, and must take remedial actions to develop an IEP that is reasonably calculated to enable B.S. to receive educational benefit.

207.   In reaching these conclusions, the undersigned has fully considered the District's well-taken point that the obligation to provide a free appropriate public education does not mean that the school district must provide a service that will maximize a child's potential.  Johnson v. Independent School District No. 4 of Bixby, 921 F.2d 1022 (10th Cir. 1990).

208.   The educational program of a school district need only be reasonably calculated to provide educational benefit.  J.S.K. v. Hendry County School Board, 941 F.2d 1563 (11th Cir. 1991).

209.   A free appropriate public education does not mean that the school district must provide the best possible education as if its resources were unlimited.  Barnett by Barnett v. Fairfax County School Board, 927 F.2d 146 (4th Cir. 1991).

210.   The IDEA does not promise perfect solutions to the vexing problems posed by the existence of disabilities in children.  The Act sets modest goals; and emphasizes appropriate rather than an ideal education; it requires an adequate rather than an optimal IEP.   The IEP must afford some educational benefit to the child.  Lynn v. Portland School Committee, 20 IDELR 342 at 343, 998 F.2d 1083 (1st Cir. 1993).  See also Hartford School District, 20 IDELR 787 (SEA VT 1993).

211.   An IEP is appropriate if it is reasonably calculated to enable the child to receive educational benefit.  That benefit must be meaningful but there is no requirement to maximize each

student's potential.  <u>School Board of Martin County v. A.S.</u>, 727
So. 2d 1071 at 1074 (Fla. 4th DCA 1999).

212.  Even where a private school's program provides a
student with a better education than that offered by a public
school, the school district is not required to reimburse the
parents for the private school if the IEP proposed by the school
meets the minimum federal standard of appropriateness.  <u>Hampton
School District v. Dobrowolski</u>, 976 F.2d 48 (1st Cir. 1992).

213.  It is noted that an IEP need only meet minimum
standards, and that parents have the burden of proving that they
or their child were prejudiced by serious procedural violations,
and that technical procedural flaws do not serve to invalidate an
IEP.  Nonetheless, the undersigned must conclude that the
procedural flaws in this case were so pervasive, and became so
intertwined with the substance of the IEP that was finally
written on September 15, 1999, as to render that IEP
inappropriate.

214.  Schools must comply with the procedural requirements of
federal and state law.  Schools may not rely on <u>Rowley</u> for
latitude in complying with these procedural standards.  The court
in <u>Daniel R.R. v. State Bd. of Educ.</u>, 874 F.2d 1036, 1041 (5th
Cir. 1989), warned that the procedural guarantees are not

> Mere procedural hoops through which Congress
> wanted state and local educational agencies
> to jump.  Rather, "the formality of the
> [IDEA's] procedures is itself a safeguard
> against arbitrary or erroneous
> decisionmaking." . . .  Indeed, a violation
> of the [IDEA's] procedural guarantees may be
> a sufficient ground for holding that a school
> system has failed to provide a free

> appropriate public education and, thus, has
> violated the [IDEA]. . . .

(citations omitted).

215.    "Rowley teaches that courts must subject IEPs to a
strict review when determining whether they are procedurally
deficient." <u>Doe by Doe v. Defendant I</u>, 898 F.2d 1186, 1190 (6th
Cir. 1990).   "[T]he measure and adequacy of an IEP can only be
determined at the time it is offered to the student, and not at
some later date.   Neither the statute nor reason countenance
`Monday Morning Quarterbacking' in evaluating the appropriateness
of a child's placement." <u>Fuhrmann v. East Hanover Bd. of Educ.</u>,
993 F.2d 1031, 1040 (3rd Cir. 1993).   <u>See</u> <u>also</u> <u>Roland M. v.</u>
<u>Concord School Comm.</u>, 910 F.2d 983 (1st Cir. 1990).

216.    IEPs must be written for a student's "unique
educational needs."   "[T]he term `unique educational needs'
[shall] be broadly construed to include the handicapped child's
academic, social, health, emotional, communicative, physical and
vocational needs." <u>Seattle School Dist. No. 1 v. B.S.</u>, 82 F.3d
1499, 1500 (9th Cir. 1996)(<u>quoting</u> H.R. Rep. No. 410, 1983
U.S.C.C.A.N. 2088, 2106).

217.    An IEP is a written statement for a disabled child,
which includes a statement of the child's present levels of
educational performance, a statement of annual goals, including
short-term instructional objectives, and a statement of special
education and related services to be provided, including the
projected date for initiation and anticipated duration of such
services.   <u>See</u> 20 U.S.C. Section 1401(a)(20); 34 C.F.R. Section

300.346; 34 C.F.R. pt. 300, App. A., Ques. 1; Rule 6A-6.03311, Florida Administrative Code.

218. The IEP proposed in this case is procedurally flawed, does not meet the requirements for preparing an IEP that is reasonably calculated to provide B.S. with educational benefit. Thus, the District violated B.S.'s right to a free and appropriate public education as required by state and federal statutes, rules, and regulations.

219. The statement of present levels of educational performance should accurately describe the effect of the child's disability on the child's performance in any area of education that is affected, including:  (1) academic areas (e.g., reading, math, and communication), and (2) non-academic areas (e.g., daily life activities and mobility).

220. The statement of present levels should be written in objective measurable terms, to the extent possible.  Data from the child's evaluation would be a good source of such information.  Test scores that are pertinent to the child's diagnosis might be included, if appropriate, but should be self-explanatory or the explanation should be included.  Further, there should be a direct relationship between the present levels of educational performance and the other components of the IEP. See 34 C.F.R., pt. 300, App. C, Ques. 36, at 85.

221. In the instant case, the present levels of performance are not written in objectively measurable terms and are not directly related to the other components of the IEP.

222.  Annual goals are statements that describe what a child with a disability can reasonably be expected to accomplish within a 12-month period in the child's special education program. There should be a direct relationship between the annual goals and the present levels of educational performance.  Further, annual goals should be measurable.  See 34 C.F.R., pt. 300, App. A, Ques. 1; 34 C.F.R., pt. 300, App. C, Ques. 38, at 85.

223.  In this instance, the annual goals listed on the IEP are objectively measurable; however, they bear no relationship to the present levels of performance listed on the IEP.  In fact, the annual goals listed are for skills that both E.S. and Leslie Sinclair testified have already been attained by B.S.

224.  The District argues that there is no "requirement" that present levels be used as the starting point for annual goals. The District may be technically correct that no statute or rule forces it to consider a child's present levels of performance in setting goals, but at some point common sense should rear its head.  There is simply no point to the entire process if the end result is an IEP that sets "goals and objectives" that the child has already met.

225.  Once the IEP team has developed measurable annual goals for the child, the team must develop either short-term objectives or benchmarks that will enable parents, students, and educators to monitor progress throughout the year and, if appropriate, revise the IEP consistent with the child's instructional needs. Short-term instructional objectives are measurable intermediate steps between present levels of performance of a child with a

disability and the annual goals that are established for the child. The objectives are developed based on a logical breakdown of the major components of the annual goals, and can serve as milestones for measuring progress towards meeting the goals. See 34 C.F.R., pt. 300, App. A, Ques. 1; 34 C.F.R., pt. 300, App. C, Ques. 39, at 85-86.

226. In this instance, the short-term objectives relate to the annual goals and are objectively measurable. However, they bear no relationship to the present levels of performance. As a result, it is impossible to determine whether the anticipated outcomes for B.S. are being met, nor whether the placement and services are appropriate to B.S. special learning needs. See 34 C.F.R. pt 300, App. A, Ques. 1. See also 34 C.F.R. pt. 300, App. C., Ques. 37, at 86.

227. The IEP must include all of the specific special education and related services needed by the child, as determined by the child's current evaluation. These the services must be listed in the IEP even if they are not directly available from the District, and must be provided by the agency through contract or other arrangements. All modifications to a child's program must also be described in writing on the IEP. Further, the amount of services to be provided by the District must be stated in the IEP in a manner that is clear to all who are involved in both the development and implementation of the IEP. Ranges of services may not be used because of personnel shortages or uncertainty regarding the availability of staff. See 34 C.F.R.

pt 300, App. A, Ques. 1, 31, 34 and 35. <u>See also</u> 34 C.F.R., pt.
300, App. C., Ques. 44, at 86-87 and Ques. 51, at 88.

228.   Several modifications were listed for behaviors in this
IEP, but were lacking in specifics.  "Additional assistance for
teacher" is listed, but no date provided for the initiation and
duration of services for the teacher's aide.

229.   Modifications to the regular physical education program
that are necessary for a child's participation in that program or
a specially designed physical education program must be described
in the child's IEP.  If a child requires a specially designed
physical education program, then that program must be addressed
in present levels, annual goals, short-term objectives, and
related services to the same extent as other special education
services.  The IEP provides no specifics for modifications to the
physical education program necessary to accommodate B.S.'s
participation.

230.   The District argues that the only requirement is that
the program modifications be listed, "not that every adaptation
to curriculum and instruction provided to the student be listed
in the IEP."  Again, common sense indicates that there must be
some middle ground between an IEP so detailed that it
"substitutes for a lesson plan," and this IEP, which addresses
the subject of modifications in such vague generality that one
cannot with confidence state that the IEP team had any idea
whatsoever of B.S.'s specific needs.

231.   Moreover, there is no specific listing for speech and
language services, notwithstanding that one of B.S.'s main

disabilities is in the area of speech and language.  <u>See</u> 34
C.F.R., pt. 300, App. C., Ques. 48, at 87.

232.  In <u>Cleveland Heights-Univ. Heights City School Dist. v.
Boss</u>, 144 F.3d 391 (6th Cir. 1998), the court found an IEP
procedurally defective because it lacked appropriate objective
criteria for measuring the student's progress, which "went to the
heart of the substance of the plan."  In the instant case, the
IEP fails to provide meaningful objective goals and objectives,
and the present levels are inadequate.   The IEP team did not
have sufficient information to develop an IEP.  Moreover,
Ms. Morris pushed the IEP team to complete the IEP without input
from E.S..  This denied E.S. the opportunity to make informed
decisions about her son's IEP and placement, and caused the
District to develop an IEP that may be inappropriate for B.S.'s
needs.

233.  The District in several instances failed to provide
E.S. with timely notice prior to meetings.  Despite the
District's policy of providing parents with 10 days' notice of
meetings, the District provided as little as 1 day's notice.
E.S. was entitled to "reasonable notice" before a change in
placement.  In this case, a decision was made on September 15,
1999, but notice was not delivered to E.S. until 5 days <u>after</u> the
fact for a change in placement and provision of services to B.S.
scheduled to occur on the very day the notice was received.

234.  The District failed to include E.S. in the development
of the IEP.  The District argues that it had no choice but to
proceed on September 15, 1999, because it was in the best

interests of B.S. to complete the annual IEP review.  The
District contends that the decision facing it on September 15 was
not whether to continue the meeting to a time when E.S. could
attend and complete the IEP.  Rather, the District argues, the
decision was "whether to delay the meeting a substantial amount
of time until all the additional evaluations [E.S.] requested
could be performed, <u>knowing the previous IEP was already out of
compliance because it was already over one year old and hearing
reports that vital components of the IEP were not being
implemented at [B.S.]' present educational placement.</u>"  (Emphasis
added.)

235.  This argument is disingenuous at best.  The previous
IEP was out of compliance due to the District's indifference to
completing the required evaluations from June 1998 until late
March 1999.  The "reports" about "vital components of the IEP"
not being implemented is apparently a reference to
Ms. Blankenship's questionable observations.  Although E.S. had
agreed to extend the previous IEP beyond its 1-year review line,
the District rushed to complete its evaluations in about a 1-week
period and precipitously schedule an IEP meeting.  Even accepting
that the District's chief concern was the best interests of B.S.,
it was late arriving at that concern.

236.  It is apparent from the sum of the testimony and
exhibits presented in this proceeding that the District's
overriding concern, once it paid any attention to the matter at
all, was to get B.S. out of Eden Florida and into Villas
Elementary School.  Whether the prime motivation was financial,

or a genuine concern that Eden Florida was not providing proper services to B.S., or a happy confluence of the two, it is plain that the head of the District's ESE program decided to place B.S. in Villas Elementary at least 5 days before the IEP team sat to meet on September 15, 1999, and that he communicated that decision to the chair of that IEP meeting on September 10.   The need to place B.S. in Villas Elementary by September 20, 1999, was the driving force behind the headlong rush to complete the IEP on September 15, whether or not the child's parent was present at the meeting.

237.   The District failed to provide E.S. with a publicly funded IEE or schedule a due process hearing after she demanded an IEE.   This is one of the procedural safeguards to which she is entitled under the District's policies and procedures.   At the September 15, 1999, IEP meeting, E.S. very clearly stated that she wanted an IEE and set forth the specific evaluations that she wanted, as well as identifying the problems that existed with the evaluations that had been performed.   E.S. followed this statement with a request through her attorney on September 22, 1999.   The District waited three weeks, then responded with an offer to have its own personnel perform the requested tests.

238.   The District had predetermined placement for B.S., contrary to the requirements of the IDEA.   Evaluations conducted at Eden Florida by District personnel were rushed not for the benefit of B.S. but to meet a District deadline.   As evaluative tools, the tests are questionable if for no other reason than that they were administered so close together.

239.  When considered in conjunction, these procedural deficiencies are substantial and clearly violate the guaranteed IDEA and state procedural protections.  The process leading to the development of this IEP was so tainted by indicia of bad faith and prejudgment that it could not help but leave the undersigned unconvinced of the quality of the final decision's substance.

240.  E.S. vigorously argues that the placement at Villas Elementary is inappropriate for B.S. because of the significant similarities between the classroom at Villas and the classroom in North Carolina in which B.S. experienced a vertiginous regression.  E.S. points to the progress that B.S. has made at Eden Florida, and to the testimony of Ms. Sinclair that Eden remains the proper placement for B.S. until such time as he is ready for a less restrictive environment.

241.  The District just as vigorously argues that it has legitimate concerns about the education provided at Eden Florida. It argues that among the many reasons to doubt that Eden can provide appropriate educational services to B.S. is that Eden's staff lacks experience, that Eden artificially limits its instructional methodology to the discrete trial method, and that Eden does not provide the least restrictive environment for B.S. in accordance with 34 CFR Section 300.550.

242.  The undersigned declines to direct a placement for B.S. on the record of this proceeding.  Neither Eden Florida nor Villas Elementary appears as woeful as its antagonists would have it seem, nor as wondrous as its proponents would have it.  The

question is the proper placement for B.S.  Villas Elementary may well be the proper placement, but the September 15, 1999, IEP is so tainted by its development process that the District's decision cannot be relied upon as a reasoned judgment based on the best interests of B.S.  It is concluded that the better course is for B.S. to "stay put" at Eden Florida until such time as E.S. is provided the IEE she initially requested and a proper IEP may be written.

243.  The District relies on 34 CFR Section 300.502(b)(1), which provides that a parent has the right to an IEE at public expense "if the parent disagrees with an evaluation obtained by the public agency."  The District argues that E.S. did not "disagree" with its evaluations; rather, she merely asked for more evaluations.

244.  It is concluded that the District may not rely on E.S.'s impromptu, uncounseled statements at the September 15, 1999, IEP meeting as her final legal position, particularly in light of later statements made by E.S. through her lawyer.  It was obvious even from the discussion at the IEP meeting that E.S. did not agree with these evaluations insofar as the District was attempting to make them the basis of an IEP for her son.  E.S. is entitled to the IEE she seeks, at no cost to her.

## ORDER

Based on the foregoing findings of fact and conclusions of law, it is

**ORDERED AND ADJUDGED that**

The placement of B.S. in Villas Elementary School pursuant to the September 15, 1999, IEP is inappropriate, due to the procedural and substantive irregularities that tainted the development of the IEP. As soon as practicable, the District will publicly fund an IEE for B.S., or ensure that the IEE is provided at no cost to E.S., consistent with the request of E.S. The District will then write a new IEP in conformance with all available relevant data. B.S. will remain in "stay put" status at Eden Florida until such time as the new IEP is completed and a placement for B.S. is determined.

DONE AND ORDERED this *17th* day of November, 1999, in Tallahassee, Leon County, Florida.

LAWRENCE P. STEVENSON
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675   SUNCOM 278-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this *17th* day of November, 1999.

COPIES FURNISHED:

Honorable Tom Gallagher
Commissioner of Education
Department of Education
The Capitol, Plaza Level 08
Tallahassee, Florida  32399-0400

Michael H. Olenick, General Counsel
Department of Education
The Capitol, Suite 1701
Tallahassee, Florida  32399-0400

Dr. Bruce Harter, Superintendent
School Board of Lee County
2055 Central Avenue
Fort Myers, Florida  33901-3988

Iris Anderson, Program Specialist
Procedural Safeguards
Department of Education
325 West Gaines Street
Tallahassee, Florida  32399-0400

J. Michael Hussey, Esquire
Paul E. Liles, Esquire
J. Michael Hussey & Associates
Post Office Box 540
Fort Myers, Florida  33902-0540

Keith B. Martin, Esquire
School Board of Lee County
2055 Central Avenue
Fort Myers, Florida  33901-3988

## NOTICE OF RIGHT TO JUDICIAL REVIEW

1.   This decision and its findings are final, unless an
adversely affected party:

>             a) brings a civil action within 30 days in
>             the appropriate federal district court
>             pursuant to Section 1415(i)(2)(A) of the
>             Individuals with Disabilities Education Act
>             (IDEA); [Federal court relief is not
>             available under IDEA for students whose only
>             exceptionality is "gifted"] or
>             b) brings a civil action within 30 days in
>             the appropriate state circuit court pursuant
>             to Section 1415(i)(2)(A) of the IDEA and
>             Section 230.23(4)(m)5, Florida Statutes; or
>             c) files an appeal within 30 days in the
>             appropriate state district court of appeal
>             pursuant to Sections 230.23(4)(m)5 and
>             120.68, Florida Statutes.